## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

James L. Stottlemyer,

         **Plaintiff,**

v.                                 **Civil Action No. 2:04CV45**
                                      **( The Honorable Robert E. Maxwell)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

         **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

James L. Stottlemyer ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security

("Defendant," sometimes "Commissioner") denying his claims for Supplemental Security Income

("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

motions for summary judgment and has been referred to the undersigned United States Magistrate

Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §

636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Plaintiff filed applications for DIB on February 25, 2002, alleging disability since June 15,

2000, and on April 20, 2002, alleging disability since May 24, 2000 (R. 50-52, 53-55). Plaintiff

filed applications for SSI benefits on February 25, 2002, and April 20, 2002, alleging disability since

January 15, 2002 (R. 176-80, 181- 86). Plaintiff, in his brief, stated his onset date was May 24, 2000

(Plaintiff's brief at p. 3). Plaintiff alleged disability due to degenerative disc disease and herniated

disc in his back (R. 59). The West Virginia state agency denied these claims initially and on

reconsideration (R. 33-42). Plaintiff requested a hearing, and on October 28, 2003, Administrative Law Judge Eugene M. Bond [hereinafter "ALJ"] conducted a hearing at which Plaintiff, who was represented by David E. Furrer, Esquire, and Dr. James Ryan, a vocational expert, testified (R. 199-212). The ALJ issued a decision on March 15, 2004, finding Plaintiff could perform a limited range of light work and, therefore, was not disabled (R. 15-24). On April 30, 2004, the Appeals Council denied Plaintiff's request for review (R. 7-8). Therefore, the ALJ's decision stands as the Commissioner's final decision. Plaintiff seeks judicial review of the Commissioner's final decision.

## II. Statement of Facts

Plaintiff was born on July 2, 1963, and was forty (40) years old at the time of the ALJ's decision (R. 53). He obtained his GED in or about 1981 and has past relevant work experience, which included bakery truck driver, laborer, grinder for a factory (assembly line worker), roofer, carpenter, and cook (R. 65, 52, 60). Plaintiff last worked on October 12, 2000 (R. 57).

Robert Feddis, M.D., examined Plaintiff on December 1, 1997, at the request of Disability Determination Services (R. 98-99). Plaintiff informed Dr. Feddis that in 1982, he was involved in an automobile accident, from which he "recovered quite well." Plaintiff stated he developed "pain in his back, mainly when working in construction" two (2) or three (3) years after the automobile accident. Dr. Feddis observed Plaintiff could "walk quite well on his toes and heel" and that he "could squat well" and that he had "a good range of motion in his back." His "straight leg raising test was present to seventy degrees on each side." Plaintiff demonstrated deep tendon reflexes that were equal and normal, no sensory changes, good grip with each hand, and no muscle wasting or weakness. There was only mild tenderness present over the paravertebral muscles on each side of the lumbar area   (R. 98). The x-ray that was taken on that date showed "some narrowing and

2

degeneration of the space between L5 and S1 with minimal osteophyte formation." Dr. Feddis diagnosed "mild chronic low back strain and degeneration." He could not "find any evidence of nerve root pressure" and he noted Plaintiff's "history would not suggest this." Dr. Feddis opined Plaintiff was "overweight, out of condition and quite inactive, all of which will aggravate his symptoms." He further opined that Plaintiff was able to sit, stand and walk without assistance, should avoid lifting over fifty (50) pounds or carrying over seventy-five (75) pounds "at least until he can get his body into better condition" (R. 99).

On October 10, 2000, Plaintiff underwent a neurosurgical consultation examination with Kheder Ashker, M.D. Plaintiff informed Dr. Ashker that he experienced low back pain, which had increased in "intensity in the last two years." Plaintiff had been treating his back pain with Ibuprofen. Dr. Ashker observed Plaintiff could stand, walk on toes and heels, and get up from a squat position without any difficulty. His back range of motion was limited on flexion to thirty (30) degrees, extension to ten (10) degrees, and lateral bending to ten (10) degrees. Plaintiff's straight leg raising was sixty (60) with pain. Dr. Ashker diagnosed chronic back strain. He gave Plaintiff a two-week sample of Daypro, urged him to obtain the care of a family physician, and provided names and telephone numbers of three such physicians to Plaintiff. Dr. Asker ordered an x-ray of Plaintiff's lower back and scheduled a follow-up visit. Plaintiff did not keep his appointment (R. 165).

On October 19, 2000, Husam Semaan, M.D., completed an annual physical examination of Plaintiff (R. 146-47). Plaintiff stated he experienced back pain with numbness in both extremities. He informed Dr. Semaan that he had been Dr. Ashker two (2) weeks earlier and was prescribed Daypro for his symptoms, which offered "some relief." Plaintiff reported he smoked approximately

four (4) to five (5) cigarettes per day; drank "about 6 pitchers every time" he consumed alcohol, but did not drink every day; and occasionally used marijuana (R. 146). Dr. Semaan observed no numbness or weakness in his arms or lower extremity, normal gait, negative straight leg raising test bilaterally, mobility of spine within normal limits, and moderate tenderness in the lumbar sacral area (R. 146A). Dr. Semaan reviewed a September 2000 x-ray, which showed "degenerative disease" and "[c]hanges in L4, L5, and L5,S1." He recommended Plaintiff decrease his weight and increase his range of motion with exercise. He continued Plaintiff's prescription for Daypro, prescribed Flexeril, 10mg, and recommended physical therapy for two (2) weeks (R. 147).

On November 16, 2001, Plaintiff reported to the emergency department of Sacred Heart Hospital with complaints of lower back pain. He was prescribed Percocet and Flexeril and the physician recommended Plaintiff do back exercises (R. 131-35).

On November 29, 2001, with the referral of Beverly Calkins, M.D., Plaintiff underwent a MRI of his lumbar spine, which revealed a moderate-sized right L4-5 herniated nucleous pulposus and moderate, chronic degenerative changes in the L5-S1 disc (R. 103). A copy of the MRI results were provided to Dr. Ashker (R. 103).

On December 5, 2001, Dr. Ashker corresponded with Dr. Calkins, who had referred Plaintiff to Dr. Ashker. Plaintiff's chief complaint to Dr. Ashker was of constant low back pain and periodic bilateral leg pain. He stated the pain was aggravated with movement, sitting, and standing for long periods of time. Dr. Ashker observed Plaintiff was overweight, able to walk on toes and heels, and able to rise from the squat position on one foot at a time. He presented with limited back range of motion, tenderness in the lumbosacral area, and pain when straight leg or bent knee raising. His sciatic notch was not tender. Dr. Ashker diagnosed disc herniation at L4-L5 level and severe

back strain. He recommended physical therapy and not surgery. He encouraged Plaintiff to lose weight and perform back exercises. He instructed Plaintiff to return in six (6) weeks for a follow-up examination (R. 164).

On December 10, 2001, Plaintiff began physical therapy. Amy Adams, MPT, was informed by Plaintiff that he had two (2) herniated discs, his pain was 8/10 constant and 10/10 maximum, he used hot showers and medications to decrease symptoms, he had not applied heating pads or ice to his back, and he experienced no numbness or tingling in his lower extremities (R. 112). Therapist Adams' assessment was for lumbar radiculopathy and low back pain. Plaintiff was to undergo physical therapy two (2) to three (3) times per week for four (4) to six (6) weeks (R. 113).

On December 12 and December 14, 2001, Plaintiff underwent physical therapy. He performed his exercises without difficulty and experienced decreased symptoms as a result thereof. Plaintiff stated he received minimal relief from the physical therapy treatments (R. 111).

On December 17, 2001, Plaintiff attended physical therapy and reported he continued to have pain and stiffness. He performed his exercises without difficulty and a decrease in symptoms resulted therefrom. On December 19 and December 21, 2001, Plaintiff did not attend his physical therapy sessions (R. 110).

Plaintiff visited the emergency department of the Sacred Heart Hospital, located in Cumberland, Maryland, on December 21, 2001, with complaints of back pain (R. 123-24). Reed A. Erickson, M.D., treated Plaintiff. He observed tenderness to palpation in Plaintiff's paralumbar and sacroiliac area, positive straight leg raising, equal and symmetrical reflexes, and no gross sensory deficits. He diagnosed sciatica, prescribed Lorcet Plus, and discharged Plaintiff as stable (R. 124).

On December 27 and December 29, 2001, Plaintiff reported to physical therapy and stated

5

he experienced some improvements. Plaintiff tolerated the treatments with a decrease in symptoms (R. 109). On December 31, 2001, a status report from Therapist Adams to Dr. Caulkins read that Plaintiff continued "to have numbness throughout the right lower leg and into the right foot" and that he reported "minimal pain in the back and a decrease in pain medicine use." Therapist Adams requested approval of therapy sessions for three (3) times per week for an additional four (4) to six (6) weeks (R. 108).

On January 2, 2002, Plaintiff reported to the physical therapist that he continued to have numbness throughout his leg but was not experiencing any specific pain. On January 4, 2002, Plaintiff reported he continued to improve to Therapist Adams. At both of these sessions, Plaintiff performed all exercises without difficulty and tolerated the treatment with a decrease in symptoms (R. 107).

On January 7, 2002, Plaintiff reported to Therapist Adams that he was feeling better, that the pain had decreased, but that the numbness in his leg persisted. Plaintiff performed exercises without difficulty and tolerated the treatment with a decrease in symptoms. On January 9, 2002, Plaintiff reported to the therapist that he had improved significantly. On January 11, 2002, Plaintiff reported to Christopher Whiteman, PTA, that his back pain and discomfort continued (R. 106). On January 14 and January 21, 2002, Plaintiff reported to the physical therapist Whiteman that he experienced no change in his symptoms (R. 104-05).

On January 14, 2002, Plaintiff returned to the care of Dr. Ashker with complaints of low back pain and right leg pain. Dr. Ashker's examination revealed Plaintiff's back pain was "worse with bent knee raising on the right." "[N]ot much pain" was experienced by Plaintiff with straight leg raising. Plaintiff was able to walk on toes and heels and rise from a squat position "without

difficulty." Dr. Ashker diagnosed "disc herniation practically without any sciatic findings, but [Plaintiff had] sciatic type pain on the right" and "back strain." Plaintiff informed Dr. Ashker that he intended to cease physical therapy and Dr. Ashker approved (R. 162).

On June 3, 2002, Plaintiff completed an Activities of Daily Living report. He stated he lived in a house with his family. Plaintiff noted he had difficulty sleeping at night. Plaintiff retired at 10:00 p.m. and awoke between 8:00 and 10:00 a.m. He stated he "used to get up early to get things done. But now I'm really slow because of being so stiff and sore in the mornings. . . . A lot of times I have to lay on my side to ease the pain of setting [sic] and standing." Plaintiff sated he required help caring for his personal needs, such as bathing, dressing, shaving, and getting out of chairs and bed (R. 75). Plaintiff stated his wife does "mostly all cooking" and that he had gained weight "because of not being as active" as he once was. Plaintiff acknowledged he performed child care duties. He stated his wife and child assist him "all the time running after things" and "picking up things" he cannot reach (R. 76). Plaintiff stated he shopped for food for one (1) hour at a time, two (2) times per week. Plaintiff stated he drove to his destinations. He listed, as activities and interests, the following: read newspaper one-half hour per day; read books two (2) hours per day; watched television two (2) hours per day, listened to the radio two (2) hours per day; and listened to records and tapes for two (2) hours per day. Plaintiff listed his hobbies and interests as follows: hunting, fishing, church activities, and walking. He stated he had lost interest in all hobbies, but that he attended church two (2) times per week (R. 77). Plaintiff stated he visited his brother three (3) or four (4) times per week for three (3) to four (4) hours each time, and he visited his mother two (2) to three (3) times per week for three (3) to four (4) hours per time. In answer to the question, "Do you ever have problems concentrating?," Plaintiff responded "Yes . . . Because of being in pain all

7

the time and not have finances to help my family keeps me from making any kind of plans for my future and keeps me distracted" (R. 78).

On August 4, 2002, Kip Beard, M.D., conducted a consultative examination of Plaintiff (R. 148-52). Plaintiff's chief complaint was constant, extreme back pain. He stated he experienced "toothache-like pain that radiates to the right groin as well as to the right leg" and that he experienced "intermittent numbness and tingling in the right leg." Plaintiff stated his pain increased when he bent, stooped, sat, lifted, rode in a vehicle, stood, mowed the grass, made the bed, or stood to do dishes. Plaintiff informed Dr. Beard that he occasionally wore a back brace and applied heat and ice to his back, that physical therapy made his symptoms worse, that he'd never been referred to a pain clinic, and that he did "not use a TENS unit" (R. 148). Dr. Beard noted Plaintiff's medications included hydrocodone. Dr. Beard observed Plaintiff to be obese, to ambulate slowly but without aids or assistive devices, to stand without assistance, and to be uncomfortable while seated and in the supine position (R. 149). Dr. Beard's examination of Plaintiff's knees revealed mild crepitations, but no tenderness, redness, warmth, swelling, effusion, or laxity. Knee extension was normal. Plaintiff's ankles and feet were non-tender and not red, warm or swollen. Plantar flexion and dorsiflexion of the ankles were normal (R. 151).

Plaintiff's dorsolumbar spine revealed normal curvature. He presented with pain in his range of motion testing, paravertebral tenderness, and moderate left paravertebral muscular spasm. Plaintiff's flexion was limited to sixty (60) degrees, extension to fifteen (15) degrees, and lateral bending was normal. Plaintiff demonstrated difficulty standing on his right leg alone. Plaintiff's seated straight-leg raising test was normal to ninety (90) degrees on the right with dorsiflexion producing pain and was normal to ninety (90) degrees on the left. Plaintiff's supine straight-leg

raising was seventy-five (75) degrees bilaterally with right-sided lower back pain and left leg pulling. His hip flexion was ninety-five (95) degrees bilaterally without pain or tenderness. Plaintiff's neurologic examination showed no weakness, atrophy, or sensory discrepancies, but diminished right Achilles deep tendon reflexes. Plaintiff demonstrated mild difficulty heel walking and toe walking and heel-to-toe walking. Plaintiff could squat "about two-thirds away with lower back pain." Dr. Beard's impression was of chronic lower back and right lower extremity pain and chronic lumbosacral strain with right lower extremity nerve root irritation. He opined there was "[n]o sensory or motor discrepancies that suggest nerve root impingement" (R. 151).

On August 22, 2002, a state agency physician completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff (153-60). The state agency physician found Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty-five (25) pounds, stand and/or walk for a total of about six (6) hours in an eight (8) hour work day, and push and/or pull unlimited (R. 154). The state agency physician found Plaintiff should frequently avoid climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and should occasionally avoid climbing ladders, ropes, and scaffolds (R. 155). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 156-57). The state agency physician found Plaintiff should avoid concentrated exposure to extreme cold (R. 157). The state agency physician found Plaintiff's RFC to be for up to medium work (R. 158).

On October 31, 2002, Fulvio R. Franyutti, M.D., a state agency physician, concurred with the August 22, 2002, findings of the previous state agency physician (R. 160).

On June 9, 2003, Plaintiff was examined by Dr. Malik for back and leg pain (R. 170-73). He observed pain in Plaintiff's hip (R. 173).

9

On July 1, 2003, Dr. Ashker corresponded with Tasneem Malik, M.D., who had referred Plaintiff to Dr. Ashker for examination. Dr. Ashker stated the MRI of Plaintiff, which was performed on June 16, 2003, showed degenerative disc disease at the L4-L5 level. Dr. Ashker opined Plaintiff had "no significant disc herniation" and that the MRI was "essentially unremarkable." Dr. Ashker stated Plaintiff had been prescribed hydrocodone. The examination of Plaintiff revealed he was overweight, able to stand, able to walk on toes and heels without difficulty, and able to rise from the squat position without difficulty. Plaintiff's back range of motion was limited to: flexion, thirty (30) degrees; extension, ten (10) degrees; and lateral bending, ten (10) degrees. There was tenderness in the lumbosacral area. Plaintiff's straight leg raising caused back pain at thirty (30) degrees, and his bend knee raising caused back pain. Dr. Ashker found "no rise to sciatica." Plaintiff's reflexes were "+2" in both knee jerks and +1 in both ankle jerks. His pinprick sensation was normal. Dr. Ashker diagnosed chronic back strain, degenerative disc disease (long standing), obesity, and prolonged use of narcotics. He recommended a bone scan of Plaintiff and that Plaintiff perform back exercises and consult a dietician for weight reduction. Dr. Ashker opined there was no "surgical lesion" (R. 163).

On July 15, 2003, Plaintiff was examined by Dr. Ashker, who stated the bone scan showed "increased activity in the shoulders and 6th rib with minimal activity in the spine." Plaintiff stated his pain was continuous. Dr. Ashker opined the pain was "possibly arthritis." He diagnosed degenerative disc disease and noted Plaintiff's prolonged use of pain medication. He recommended Plaintiff seek the care of an arthritis or pain clinic management specialist (R. 162).

On July 21, 2003, Dr. Malik examined Plaintiff, who complained of low back pain. He diagnosed chronic back pain and obesity. He instructed Plaintiff to diet. He ordered an MRI of the

10

lower spine, prescribed Percocet, and instructed Plaintiff to return in one month (R. 174-75).

On July 29, 2003, Dr. Malik completed a Physical residual functional capacity questionnaire of Plaintiff (R. 166-69). Dr. Malik opined Plaintiff was not a malingerer, that his impairments were "reasonably consistent" with his symptoms, that his pain was constant, and that he was capable of low stress jobs. Dr. Malick stated Plaintiff was capable of walking less than one (1) block, of sitting for fifteen (15) minutes before needing to stand, and of standing for fifteen (15) to twenty (20) minutes before needing to sit or walk (R. 167). He opined Plaintiff could sit or stand/walk less that two (2) hours in an eight (8) hour workday, but he did not need to include periods of walking in an eight (8) hour workday. Plaintiff, according to Dr. Malik, needed to take unscheduled breaks in an eight (8) hour workday. He did not offer any opinion as to Plaintiff's need to shift positions at will, and he opined Plaintiff did not require the assistance of ambulatory devices. Dr. Malik noted Plaintiff's maximum lifting capacity was for less than ten (10) pounds and Plaintiff should never crouch, climb ladders, or climb stairs, or rarely twist, stoop (R. 168-69). Dr. Malik found Plaintiff had significant limitations in doing repetitive reaching, handling, or fingering. Dr. Malik also found Plaintiff could only grasp, turn, and twist objects with his hands; use his fingers for fine manipulation; or reach overhead with his arms twenty (20) percent of the time in an eight (8) hour workday. Dr. Malik noted Plaintiff would have "good days" and "bad days" and would have to be absent from work for more than four (4) days per month.

At the administrative hearing, held on October 28, 2003, Plaintiff testified his driving was not impaired because of his back pain. He stated his activities of daily living included preparing a bowl of cereal for breakfast, taking pain medication, sitting in his recliner, telephoning his mother, eating lunch, and sitting again in the recliner. Plaintiff testified that he occasionally attempted to

11

"piddle around" in the basement and occasionally visited his brother or mother (R. 204-05). Plaintiff stated he attended church services two (2) times on "basically" every Sunday, which lasted about two (2) hours each. Plaintiff testified the medication he took for his back helped "somewhat" (R. 205). Plaintiff testified that driving two (2) hours and changes in the weather caused pain (R. 206).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Bond made the following findings:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's spinal disc disorders (discogenic and degenerative) are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(b).

4.  The medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant retains a residual functional capacity for less than the full range of light unskilled work. The undersigned finds that the claimant is precluded from occasionally lifting and/or carrying of objects weighing more than 20 pounds; frequently lifting and/or carrying of objects weighing more than 10 pounds; and limited to a job with the option to sit/stand (20 CFR §§ 404.1567 and 416.967). Unskilled work is work that needs little or no judgment to do simple duties that can be learned on the job in a short period of time (20 CFR §§ 404.1568 and 416.968).

7.  The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8.     The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9.     The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10.    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.    The claimant has the residual functional capacity to perform a significant range of work (20 CFR §§ 404.1567 and 416.967).

12.    Although the claimant's limitations do not allow him to perform the full range of work, using Medical-Vocational Rule 202.18 or 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs were provided at a hearing by the vocational expert, as described above.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.

1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  The ALJ erred in not providing controlling weight to the opinion of the treating physician in accordance with SSR 96-2p and in failing to ascribe any weight or consideration to the medical opinion of the treating source.

2.  The ALJ failed to articulate and analyze Plaintiff's complaints of pain as set forth in guidelines 20 § CFR 404.1529 and SSR 96-7p.

Defendant contends:

1.  The ALJ properly afforded less than controlling weight to the treating physician's opinion and articulated his basis for rejecting the treating physician's residual functional capacity assessment.

2.  The ALJ properly evaluated Plaintiff's subjective complaints of pain and limitations in accordance with the regulations.

## C. Treating Physician

The Plaintiff contends the ALJ erred in not providing controlling weight to the opinion of the treating physician in accordance with SSR 96-2p and in failing to ascribe any weight or consideration to the medical opinion of the treating physician. The Defendant contends the ALJ properly afforded less than controlling weight to the treating physician's opinion and articulated his basis for rejecting the treating physician's residual functional capacity assessment.

SSR 96-2p states, in part:

Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and

14

416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight.

3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record. However, when all of the factors are satisfied, the adjudicator must adopt a treating source's medical opinion irrespective of any finding he or she would have made in the absence of the medical opinion.

The ALJ found, relative to the physical residual functional capacity assessment of Dr. Malik,

Plaintiff's treating physician, the following:

Dr. Malik completed a physical residual functional capacity questionnaire on the claimant dated July 29, 2003. He reported that the claimant complained of back pain, leg pain, diffused body aches, exacerbated by sitting and prolonged standing. Dr. Malik reported that the claimant was prescribed Hydrocodone and Percocet, both of which could cause nausea, dizziness and drowsiness. Dr. Malik reported that the claimant constantly experienced pain or other symptoms severe enough to interfere with attention and concentration; however he stated that the claimant was capable of performing low stress jobs. Dr. Malik reported that the claimant could walk up to less than one block; sit for 15 minutes at a time; and stand for 15 to 20 minutes at a

15

time. Dr. Malik reported that in an 8-hour workday the claimant could only sit or stand/walk for less than 2 hours in an 8-hour workday. He stated that the claimant did not need to include periods of walking around during an 8-hour workday. However, he stated that the claimant needed to take unscheduled breaks during an 8-hour workday. Dr. Malik stated that the claimant's legs did not require elevation with prolonged sitting and that the claimant did not require the use of a cane or assistive device while engaging in occasional standing/walking. He reported that the claimant could lift and carry in a competitive work situation up to less than 10 pounds and could rarely twist and stoop (bend). Dr. Malik stated that the claimant should never crouch, climb ladders or climb stairs. Mr. Malik reported that the claimant had significant limitation in doing repetitive reaching, handling or fingering. Dr. Malik reported that in an 8-hour workday the claimant could perform grasping, turning and twisting of objects; fine manipulations; and reaching (including overhead) 20 percent of the time on the right and left. He stated that the claimant's impairments would likely product "good days" and "bad days." Mr. Malik reported that the claimant was likely to be absent from work as a result of his impairment or treatment more than 4 days per month (R. 19-20).

The undersigned notes that Dr. Malik reported . . . that the claimant would most likely be absent from work for more than 4 days per month; and his functional limitations of the claimant limited him to performing less than the full range of sedentary work (Exhibit 10F). The undersigned finds that Dr. Malik's functional limitations of the claimant are not consistent with the medical evidence . . . (R. 21).

The undersigned finds that in reaching this conclusion, the ALJ correctly applied SSR 96-2p. Dr. Malik was Plaintiff's treating physician from June 9, 2003, to July 29, 2003, and his opinion was a "medical opinion." 20 §§ CFR 404.1527(a) and 416.927(a). The ALJ properly found the treating source's medical opinion was not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and was ". . . inconsistent" with the other "substantial evidence" in the individual's case record.

The medically acceptable clinical and laboratory diagnostic techniques on which the ALJ relied in assessing the opinion of Dr. Malik were as follows: 1) December 1, 1997, x-ray that showed some narrowing and degeneration of the space between L5 and S1 with minimal osteophyte formations (R. 17, 99); 2) September, 2000, x-ray that showed degenerative disease and changes in L4, L5,, and L5-S1 (R. 18, 147); 3) November 29, 2001, MRI that showed a moderate-sized right

L4-5 herniated nucleous pulposus and moderate, chronic, degenerative changes in the L5-S1 disk (R. 18, 103); June 16, 2003, MRI that was "essentially unremarkable" in that it showed degenerative disc disease at the L4-L5 level, but no significant disc herniation (R. 21, 163); and a July 15, 2003, bone scan that showed increased activity in the shoulders and 6th rib with minimal activity in the spine (R. 20, 162). These clinical and laboratory diagnostic techniques are substantial evidence to support the weight the ALJ assigned to the opinion of Dr. Malik. They show narrowing and degeneration; a November, 2001, MRI shows a moderate HNP. Dr. Ashker, however, opined, in his review of the June 2003 MRI, that no significant disc herniation was present and that the MRI was unremarkable. The only medical test result that was remarkable, therefore, was the November 29, 2001, MRI, which showed a right herniated nucleous pulposus at L4-5 that was *moderate* (emphasis added). The ALJ recognized this MRI and evaluated it in conjunction with the other medical tests of record. The undersigned finds that the ALJ was correct in his ruling that Dr. Malik's findings as to the Plaintiff's functional limitations were not consistent with the medical evidence.

The ALJ then examined the consistent nature of the treating source's medical opinion with the opinions of other medical professionals who examined, consulted, or treated the Plaintiff. The ALJ noted that Dr. Ashker performed consultative examinations of Plaintiff. The ALJ considered the December, 2001, examination by Dr. Ashker, at which time he observed Plaintiff was able to walk on toes and heels and able to get up from the squat position on one foot at a time without difficulty, but complained of pain. The ALJ discussed Plaintiff's limitations as to his back range of motions and lumbosacral tenderness. The ALJ noted Dr. Ashker prescribed back exercises and the loss of weight to Plaintiff as the only treatment for his back pain (R. 18, 164). The ALJ then discussed and considered the opinion of Dr. Ashker, which was formed at his January 14, 2002, consultative examination of Plaintiff. Dr. Ashker did not recommend surgery after he observed

17

Plaintiff did not experience much pain with the straight leg raising test, and Plaintiff was able to walk on toes and heels and rise from a squat position (R. 20, 162). Further, the record contained the diagnosis of Dr. Ashker on that date, which was for "disc herniation practically without any sciatic findings" and "back strain" (R. 162). The ALJ also discussed and considered the opinion of Dr. Ashker, which was rendered on July 15, 2003, at which time he observed Plaintiff's motor and sensory exams were normal and diagnosed Plaintiff with degenerative disc disease and prolonged use of pain medication. The record contains Dr. Ashker's observation that Plaintiff was overweight, able to stand, able to walk on toes and heels without difficulty, and able to rise from the squat position without difficulty (R. 20).

In addition to the relying on the opinion and findings of Dr. Ashker in deciding the weight to be afforded to the opinion of Plaintiff's treating physician, the ALJ considered and discussed the findings of Dr. Beard, who conducted an August 4, 2002, consultative examination of Plaintiff. The ALJ noted that moderate back spasms, loss of motion, questionable positive straight leg raising, no sensory or motor discrepancies that suggested nerve root impingement, limping on the right, and no assistive device for ambulation were found by Dr. Beard (R. 19, 148-52). The record contained Dr. Beard's observations that Plaintiff's seated straight-leg raising trest was normal to ninety (90) degrees on the right with dorsiflexion producing pain and was normal to ninety (90) degrees on the left. Plaintiff's supine straight-leg raising was seventy-five (75) degrees bilaterally with right-sided lower back pain and left leg pulling. His hip flexion was ninety-five (95) degrees bilaterally without pain or tenderness. His diagnosis, which was for chronic lower back and right lower extremity pain and chronic lumbosacral strain with right lower extremity nerve root irritation (R. 151). Neither Dr. Ashker nor Dr. Beard opined that Plaintiff's limitations were extreme as a result of his condition. These physicians diagnosed Plaintiff with, at least, back strains and nerve root irritation. Based on

18

the November, 2001, MRI, Plaintiff was diagnosed with a herniated disc; however, based on the June, 2003, MRI, a diagnosis of degenerative disc disease with no significant disc herniation was made. The evidence of record of Drs. Ashker and Beard as to Plaintiff's limitations, with which Dr. Malik's findings on his RFC of Plaintiff are not consistent, is substantial evidence to support the assignment of weight by the ALJ to the opinion of Plaintiff's treating physician.

Finally, the ALJ evaluated the treatment notes provided by Dr. Malik and found inconsistencies therein relative to his residual functional capacity assessment opinion. The ALJ noted Plaintiff was treated by Dr. Malik for a period covering June 19, 2003, to July 29, 2003. He discussed the observations Dr. Malik made at the two (2) examinations of Plaintiff, which were for "positive straight leg raising, back pain, and paravertebral pain. Otherwise, the rest of the examination was unremarkable. There was no evidence of atrophy or edema. Strength of his upper and lower extremities was 5/5; gait and sensory examination was normal; and neurological examination was within normal limits . . . " (R. 19). Nothing in the two examinations by Dr. Malik of Plaintiff support the findings in his RFC. The record contains evidence that Dr. Malik diagnosed back and leg pain on June 9, 2003, and chronic back pain and obesity on July 21, 2003 (R. 173, 174-75). The undersigned concludes that Dr. Malik's own treatment notes are inconsistent with the limitations he assigned to Plaintiff in his RFC.

Since Dr. Malik's RFC opinion as to Plaintiff's limitations was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence of record, which included his own observations and diagnoses, the undersigned finds ALJ was correct in not entitling said opinion with controlling weight. Additionally, as noted in the discussion above, the ALJ articulated his reasons, rationale, and basis for his rejection of Dr. Malik's opinions of Plaintiff's limitations as contained in his RFC, and the

weight he afforded to the opinion of the ALJ was proper.

The undersigned, therefore, finds the ALJ did not err in not providing controlling weight to the opinion of the treating physician; the ALJ acted in accordance with SSR 96-2p; the ALJ did not err in his assessment of weight or consideration to the medical opinion of the treating source.

### D. Credibility/Pain Analysis

Plaintiff contends that he ALJ failed to articulate and analyze Plaintiff's complaints of pain as set forth in guidelines 20 § CFR 404.1529 and SSR 96-7p. The Defendant contends the ALJ properly evaluated Plaintiff's subjective complaints of pain and limitations in accordance with the regulations.

SSR-96-7p provides, in part, the following:

> . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

The undersigned finds the ALJ correctly analyzed Plaintiff's credibility as set forth in SSR 96-7p and as mandated in *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996). The ALJ made the following finding as to Plaintiff's credibility: "[t]he undersigned Administrative Law Judge finds that the

claimant's subjective complaints are credible to the extent that he is precluded from performing work requiring a higher residual functional capacity than for less than the full range of light work with limitations . . ." (R. 21). His decision contained a thorough evaluation of the medical/laboratory findings, opinions of treating and examining physicians, and Plaintiff's own statements about his symptoms.

The ALJ found "[x]-rays and a MRI of the claimant's Lumber spine revealed moderate-sized right L4-L5 HNP and moderate chronic degenerative change in the L5-S1 disc. However, there was no evidence of nerve root impingement" and "[t]he claimant's treating neurologist, Dr. Ashker, reported on July 1, 2003 that while the claimant's MRI of the lumbar spine dated June 16, 2003, showed degenerative disc disease at L4-L5, but no significant disc herniation. He stated that there was only some slight abnormal density in the L4 vertebra" (R. 21). The ALJ considered the following medical/laboratory findings in making this determination: 1) December 1, 1997, x-ray that showed some narrowing and degeneration of the space between L5 and S1 with minimal osteophyte formations (R. 17, 99); 2) September, 2000, x-ray that showed degenerative disease and changes in L4, L5,, and L5-S1 (R. 18, 147); 3) November 29, 2001, MRI that showed a moderate-sized right L4-5 herniated nucleous pulposus and moderate, chronic, degenerative changes in the L5-S1 disk (R. 18, 103); June 16, 2003, MRI that was "essentially unremarkable" in that it showed degenerative disc disease at the L4-L5 level, but no significant disc herniation (R. 21, 163); and a July 15, 2003, bone scan that showed increased activity in the shoulders and 6th rib with minimal activity in the spine (R. 20, 162). The undersigned finds these medical/laboratory findings were adequately evaluated and considered by the ALJ and are substantial evidence to support his opinion as to Plaintiff's credibility.

The ALJ then considered the opinions of treating and examining physicians. In his decision, he found the following:

> Medical records of the claimant fail to support the severity of the pain and discomfort that he alleges. Physical examinations of the claimant were basically unremarkable, except for lumbar tenderness, occasional straight leg raising positive on the right, and limited range of motion of the lumbar spine, but not of a significant degree. He was also noted to have mild crepitation of his knees bilaterally; occasional moderate back spasm and diminished right Achilles deep tendon reflexes. There was no evidence that the claimant had limited range of motion of his upper or lower extremities, muscle atrophy, motor or sensory deficits, decreased muscle strength or grip strength, and deformities. The claimant did not require an assistive device for ambulation. He was treated conservatively with prescription medication, physical therapy, and wearing a back brace. . . (R. 21).

In formulating this decision, the ALJ relied on the opinions of those physicians who treated or examined Plaintiff. The ALJ considered Dr. Ashker's findings that Plaintiff was able to walk on toes and heels and able to get up from the squat position on one foot at a time without difficulty with complaints of pain. The conservative treatment recommended to Plaintiff by Dr. Ashker and considered by the ALJ was back exercises and the loss of weight (R. 18, 164). The ALJ considered Dr. Ashker's opinion that Plaintiff did not require surgery for his back condition. He also evaluated the finding of Dr. Ashker that Plaintiff did not experience much pain with the straight leg raising test (R. 20, 162). Further, in making the above stated conclusion, the ALJ recognized Dr. Ashker's diagnosis of "disc herniation practically without any sciatic findings" and "back strain"; the opinion of Dr. Ashker that the the June, 2003, MRI showed degenerative disc disease at the L4-L5 level, but no significant disc herniation, and was "essentially unremarkable"; and a July 15, 2003,observation by Dr. Ashker that Plaintiff's motor and sensory exams were normal and his diagnosis of degenerative disc disease and prolonged use of pain medication. (R. 20, 21, 162, 163).

In addition to those findings and opinions of Dr. Ashker, the ALJ considered and discussed the findings of Dr. Beard. The ALJ noted that moderate back spasms, loss of motion, questionable

positive straight leg raising, no sensory or motor discrepancies that suggested nerve root impingement, limping on the right, and no assistive device for ambulation were found by Dr. Beard. The ALJ also noted Dr. Beard found Plaintiff "had some difficulty with functional ambulatory abilities associated with back and right leg pain." The ALJ noted Dr. Beard's observation of the conservative treatment Plaintiff had been undergoing for his back condition, which included the application of heat and ice, but not the use of a TENS unit and not a referral to a pain clinic (R. 19, 148-52).

The ALJ also evaluated the evidence of record provided by Dr. Malik in assessing Plaintiff's credibility. He considered the results of Dr. Malik's examinations of Plaintiff, which were "positive straight leg raising, back pain, and paravertebral pain. Otherwise, the rest of the examination was unremarkable. There was no evidence of atrophy or edema. Strength of his upper and lower extremities was 5/5; gait and sensory examination was normal; and neurological examination was within normal limits . . . " (R. 19). As stated by the ALJ, the examinations of Dr. Malik of Plaintiff revealed no remarkable conditions or limitations. The undersigned finds the ALJ properly evaluated and weighed the opinions of treating and examining physicians in assessing Plaintiff's complaints of pain and that substantial evidence supports his decision that "[m]edical records of the claimant fail to support the severity of the pain and discomfort that he alleges" (R. 21).

Finally, the ALJ considered Plaintiff's own statements as to his symptoms of pain. He noted the following:

> In determining the claimant's residual functional capacity, the undersigned has taken into consideration the claimant's subjective complaints . . . . In this regard, the claimant testified at the hearing that . . . he has a driver's license and does drive without any restrictions. The claimant testified that his wife does the cleaning; and he and his wife do the cooking and shopping. The claimant testified that on a typical day, he wakes up, fixes a bowl of cereal, takes his pain medication, sits in a recliner, calls his mother, prepares and eats lunch (soup or sandwich), sits in a recliner, and

23

may ride to his mother's house for 1 to 2 hours. The claimant testified that he attends church service on Sunday and Sunday night and the services last 2 hours. The claimant testified that he does not use a cane or crutches for ambulation; and pain medication for his back helps. The claimant testified that his has difficulty driving long distances, i.e., 2 hours. The claimant testified that his pain is exacerbated due to temperature changes such as rain and cold weather (R. 20-21).

The ALJ compared the consistency of Plaintiff's statements as to limitations to the objective medical evidence. The ALJ found Plaintiff's physical examinations were "basically unremarkable, except for lumbar tenderness, occasional straight leg raising positive on the right, and limited range of motion of the lumbar spine" (R. 21) This finding was based on the there being "no evidence that the claimant had limited range of motion of his upper or lower extremities, muscle atrophy, motor or sensory deficits, decreased muscle strength or grip strength, and deformities . . . . did not require an assistive device for ambulation . . . [and] was treated conservatively with prescription medication, physical therapy, and wearing a back brace" (R. 21). Additionally, in spite of the pain alleged by the Plaintiff, the ALJ noted he was still able to drive, prepare simple meals, shop for food, telephone and visit his mother, and attend church. The undersigned finds the ALJ correctly relied on the evidence of record in concluding that Plaintiff's "subjective complaints of pain are credible to the extent that he is precluded from performing work requiring a higher residual functional capacity than for less than the full range of light work . . ." (R. 21).

Additionally, the ALJ found the following:

There is no evidence to support that the claimant's pain has constantly interfered with his attention and concentration. The claimant's pain was not of a severity that interfered with his attention and concentration to precluded [sic] him from driving, performing light household duties, attending church, and preparing light meals. Further, the claimant reported in his Activities of Daily Living Report at Exhibit 3E that he reads books for 2 hours a day, watches television 2 hours a day, listens to the radio 2 hours a day and listens to records and tapes 2 hours per day. Consequently, his attention and concentration are sufficient enough to perform these activities or light work (R. 21).

The ALJ soundly considered and discussed the inconsistent nature of Plaintiff's complaints of pain relative to his activities of daily living. Even though Plaintiff testified that his pain caused him to sit in a recliner after taking pain medication, Plaintiff was still able to drive, visit others, read, watch television, listen to radio/records, prepare light meals, and attend church, activities of which the completion are inconsistent with Plaintiff's statements of pain. Additionally, the Plaintiff testified, and the ALJ considered, that the prescribed medication helped ease his pain. The undersigned finds the ALJ properly considered and weighed these activities of daily living and properly evaluated them for inconsistencies.

Plaintiff's allegation that the ALJ's "decision fails to set forth any analysis as to [his] conclusion" is without merit. The Plaintiff asserts the ALJ "must, in the decision, set forth specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers, the weight the adjudicator gave the individual statements, and the reasons for that weight. (Emphasis added)" (Plaintiff's brief at p. 20). The ALJ, in analyzing Plaintiff's credibility, found that "[m]edical records of the claimant fail to support the severity of the pain and discomfort that he alleges"; "[p]hysical examinations of the claimant were basically unremarkable . . . "; and "[t]here is no evidence to support that the claimant's pain has constantly interfered with his attention and concentration" (R. 21). The ALJ then, as discussed above, systematically supported these findings with facts from the evidence of record. The undersigned finds the ALJ set forth an adequate analysis of Plaintiff's credibility in a specific, clearly stated method. The ALJ accurately and thoroughly considered, evaluated, and discussed the medical/laboratory findings and the opinions of the treating and examining physicians and measured them against the statements of Plaintiff.

The undersigned, therefore, finds, the ALJ did not err in his articulation and analysis of Plaintiff's complaints of pain and the ALJ correctly applied the guidelines as set forth in 20 §§ CFR 404.1529 and SSR 96-7p in his decision as to Plaintiff's credibility.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _20_ day of July, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE